UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. S1-4:09CR00012 RWS (AGF) |
| WILLIE JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by the parties. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress statements (Doc. #214), and the government filed a motion for pretrial determination of the admissibility of evidence, (Doc. #145), which included reference to the same interview that forms the basis of Defendant's motion.[1] An evidentiary hearing was held on June 23, 2009. The government was represented by Assistant United States Attorney Sirena M. Wissler. Defendant was present and represented by his attorney, Stephen R. Welby. At the hearing, the government presented the testimony of Special Agent Jarad Harper, who has been employed with the Drug Enforcement Administration ("DEA") for approximately

---

[1] Defendant had previously filed a motion to suppress the contents of electronic surveillance (Doc. #204), but later withdrew that motion and waived his right to file pretrial motions with respect to the admission of any electronic surveillance.

4½ years. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

In the summer of 2008, Special Agent ("SA") Jarad Harper was involved in the investigation of a target named Johnny Rufus Nelson. In connection with that investigation, he became aware of another target named Earnest Lenoir, Sr., named as a co-defendant herein. In connection with their investigation of Lenoir, the DEA obtained court authorization to conduct Title III wiretap interceptions of certain telephones, which interceptions were conducted during the period from September 3, 2008 to December 3, 2008. From some of the intercepted calls, the agents became aware of the involvement of Defendant Jackson, who was identified in the calls as "Rob." Through their further investigation, the agents were able to associate "Rob" with the address of Defendant's girlfriend, at 2419 Switzer, in St. Louis, Missouri, and to identify "Rob" as Defendant Jackson.

After the Title III interceptions ended, the agents obtained and executed a number of search warrants pertaining to other targets believed to be involved in the Lenoir heroin operation, and the agents also attempted to interview several of the suspected co-conspirators, including Defendant Jackson. In connection with their efforts to interview Defendant Jackson, SA Harper and his partner, Task Force Office ("TFO") Damon Kunnemann, knocked on the door at 2419 Switzer, but there was no answer. They then

called Defendant on the telephone, at approximately 2:50 p.m. on January 15, 2009, using the telephone number Defendant used during the wiretap interceptions. When Defendant answered, SA Harper asked for Rob, and Defendant responded, "This is Rob." SA Harper identified himself as a DEA agent, and asked if Defendant was willing to meet with them. The call was thereafter disconnected, but SA Harper was unable to determine whether Defendant had terminated the call or whether the connection was simply lost. The agents thereafter called again, and Defendant answered. SA Harper identified himself as a Special Agent with the DEA, and said he would like to speak to Defendant regarding an on-going investigation. He asked whether Defendant was willing to speak with them, and Defendant said yes. SA Harper advised Defendant they were parked near the Switzer address, and Defendant said he would join them there in approximately thirty minutes. Defendant described his car, a Lexus, and SA Harper gave Defendant a description of their car.

At approximately 3:25 p.m. that same day (January 15, 2009), Defendant arrived at the location where the agents were waiting, on Switzer. He was driving a car that matched the description he had given the agents on the telephone. Defendant pulled up to the agents' car, and perhaps rolled down his car window to speak with them. The agents asked Defendant if he wanted to speak inside the residence on Switzer, and he said no. They asked where he wanted to go, and he told the agents to follow him to a parking lot.

Defendant drove to the parking lot of a strip mall, on West Florissant and Jennings Road, a few minutes away, and the agents followed in their own car. Defendant parked

3

on the lot, got out of his car, and walked to the agents' car. TFO Kunnemann got into the back seat of the car, and Defendant accepted the agents' invitation to sit in the front seat of the agents' car. SA Harper and TFO Kunnemann were in an unmarked car, and were dressed casually in street clothes. Both agents were wearing sidearms, but SA Harper's sidearm was concealed by his clothing, and he believed TFO Kunnemann's sidearm would also have been concealed. At no time did either officer remove or display his firearm.

SA Harper explained to Defendant that they were conducting an on-going investigation into a heroin conspiracy. They advised Defendant that he was not under arrest, and that he would be free to leave after the interview or whenever he wanted to leave, and said that they just wanted to discuss with him his involvement in the investigation. SA Harper then read Defendant his rights under <u>Miranda</u>, using a DEA card that he keeps with him. At the hearing, SA Harper read those rights into the record as he had read them to Defendant that afternoon. When asked if he understood his rights, Defendant said yes, and when asked if he was willing to speak to them, he said that he was.

SA Harper then gave Defendant a written "Advice of Rights" form. Govt. Ex. 1. Prior to presenting the form to Defendant, SA Harper filled in the blanks at the top of the form, indicating that it was an "In-Car Interview" in "Jennings, MO" at 3:30 p.m., on January 15, 2009. He then asked Defendant to review the form, and to initial each right verifying that he understood each right after he reviewed it. He also told Defendant to let

4

them know if he had any questions. Defendant reviewed the form, placed his initials next to each right, and then executed the form. Id. After he completed the Advice of Rights form, the agents discussed with Defendant the right to prompt presentment, and presented Defendant with a "Prompt Presentment Waiver Form." Govt. Ex. 2. They explained to him that although he was not under arrest, he might have a right to be presented to a magistrate judge. This form again advised Defendant of his rights under Miranda, as well as his right, under the Federal Rules of Criminal Procedure, "to be brought before a United States Magistrate Judge without unnecessary delay." It then states, above the signature line: "I have agreed to cooperate with   SA Jarad Harper  TFO Damon Kunnemann     of the    DEA    and I hereby waive my right to be presented without delay to a Magistrate Judge." Defendant executed this form as well. Id.

After he executed both waiver forms, the agents conducted an interview of Defendant, in which he made statements incriminating himself.[2] Defendant was not restrained in any fashion, and the agents did not make any threats or promises to induce either Defendant's waiver or his statements. SA Harper did explain that if Defendant cooperated or assisted them, certain things could be offered, and that he possibly could

---

[2] On January 20, 2009, SA Harper made a report of these discussions with Defendant. The report, at the top, indicates that the events took place on January 15, 2009, but the body of the report has two references to January 13, 2009. SA Harper explained at the hearing that the references to the 13th were a typographical error. There was no evidence at the hearing to suggest otherwise, and the Court finds that the interview took place on January 15, 2009, immediately following the execution of the two waiver forms the same day.

receive some reduction in his sentence, but no promises or guarantees of any reduction or any particular results were made. During the course of the interview, the agents did not play any recordings of the intercepted calls for Defendant, but he was advised that some of his calls had been intercepted. The agents had line sheets they had printed off of some intercepted calls, and they read some of the line sheets to Defendant.

At the end of the interview, the agents advised Defendant that they appreciated his time, and he told them that he would be back in touch with them if he thought he could help them in the future. Defendant then returned to his own car. In total, Defendant was in the agents' car for approximately 45 minutes. Defendant spoke with the agents on the telephone three to four times after the January 15 interview. Defendant indicated that he could perhaps help out by pointing out some locations, but nothing of any significance developed from these telephone calls.

## CONCLUSIONS OF LAW

Defendant seeks to suppress the statements made by him during the interview in the officers' car on January 15, 2009. He does not challenge any of the subsequent telephone calls. In his motion, Defendant asserts that the interview in the car in fact occurred on January 13, 2009, and that the written report states that the rights were not provided until January 15, 2009. Defendant further contends that his statements were not voluntary. He asserts, in summary and conclusory fashion, that he was induced to make the statements by threats and promises of leniency; that he was not first advised of his rights under <u>Miranda</u>; that the interrogation did not cease after Defendant indicated that

6

he wished to remain silent and to have an attorney present; and that Defendant has a limited education and that the coercive nature of the interrogation prevented him from making a knowing and intelligent waiver of rights. The evidence presented does not support Defendant's contentions from a factual standpoint. Nor is there a legal basis for Defendant's contentions.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412, 423-24 (1986). "A waiver is knowing if it is 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' (citation omitted) It is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" United States v. Syslo, 303 F.3d 860, 865 (8th Cir. 2002) (quoting Moran, 475 U.S. at 421); accord United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (noting two distinct dimensions of the inquiry).

Further, the statement itself must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503, 513 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); see also Dickerson, 530 U.S. at 444.

As a threshold matter, though, the Court notes that Miranda warnings are required only if a defendant is both "in custody" and subjected to interrogation. See Stansbury v. California, 511 U.S. 318, 322 (1994); Miranda, 384 U.S. at 478-79. A defendant is considered in custody for purposes of Miranda "when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest." United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir.), cert. denied __ S.Ct. __, 2009 WL 1248244 (2009). The determination turns on whether, under the totality of the circumstances, a reasonable person in the suspect's position "would have felt free to end the interrogation and leave." Id. (citing United States v. Brave Heart, 397 F.3d 1035, 1038-39 (8th Cir. 2005)). Incarceration itself does not automatically render a statement involuntary. See Flittie v. Solem, 775 F.2d 933, 944 (8th Cir. 1985) (en banc). Additionally, "[w]arnings are not required 'simply because the questioning takes place in the station house, or

because the questioned person is one whom the police suspect.'" Jenner v. Smith, 982 F.2d 329, 335 (8th Cir. 1993) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

In United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), the Eighth Circuit delineated six "common indicia of custody" to be considered when determining whether a suspect is in custody while being questioned:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349. The first three factors tend to mitigate against a finding of custody, and the last three tend to weigh in favor of a finding of custody. United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). The Eighth Circuit has recognized, though, that "[t]hese factors are not exclusive." Further, "custody 'cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly.'" Elzahabi, 557 F.3d at 883 (quoting United States v. Czichray, 378 F.3d 822, 827-28 (8th Cir. 2004)). A particularly strong showing on one factor may compensate for a weak showing on other factors. See Axsom, 289 F.3d at 501; Griffin, 922 F.2d at 1349. The determination is an objective one, which does not turn on "the subjective views harbored by either the interrogating officers or the person being

9

questioned." Thatsaphone v. Weber, 137 F.3d 1041, 1045 (8th Cir. 1997) (emphasis in opinion) (quoting Stansbury, 511 U.S. at 323). "The most obvious and effective means of demonstrating that a suspect has not been taken into custody is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary." Elzahabi, 557 F.3d at 883 (quotations omitted).

On these facts, the Court finds that Defendant was not in custody at the time of his interview. Defendant was simply asked whether he would speak to the agents, and he agreed and drove to meet them in his own car. The interview took place during the afternoon, on a public parking lot. Defendant was not restrained at any time, and there is no evidence that any strong-arm tactics or deception were used. While the interview was conducted in the agents' car, the setting and location of the interview were selected by Defendant, not by the agents. He had been given the option to conduct the interview at his girlfriend's residence, or elsewhere. Most significantly, Defendant was advised at the start of the interview that he was not under arrest and that he could leave at any time. The entire encounter lasted approximately forty-five minutes, and at the end, Defendant was not arrested, but rather drove away in his own car. And there is nothing to indicate that it was "police dominated." United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985).

As such, the interrogation was not "custodial," and the agents were not required to advise Defendant of his rights under Miranda. See California v. Beheler, 463 U.S. 1121, 1125 (1983) (recognizing that suspect is not in custody simply because questioning took

place at police station, and holding that Miranda warnings were not required when Defendant voluntarily accompanied police to station, talked to police for 30 minutes, and was permitted to leave); Axsom, 289 F.3d at 500-03 (finding the defendant was not in custody for purposes of Miranda, even though officers were at defendant's home to execute search warrant, where defendant was advised that he was not under arrest and that questioning was voluntary, defendant's freedom of movement was not restrained, only two agents conducted the questioning, there was no evidence of deceptive tactics, and defendant was not placed under arrest at the end of the questioning); United States v. Galceran, 301 F.3d 927, 930-31 (8th Cir. 2002) (Miranda warning not required because defendant voluntarily went to police station upon request, was told he would not be arrested that day, was not interviewed in holding cell area, and was not arrested at conclusion of ninety-eight minute interview).

In any event, the officers nonetheless advised Defendant of his Miranda rights, and he thereafter agreed to waive his rights, both orally and in writing. The Court further finds Defendant's waiver was both knowing and voluntary. In this regard, the Court notes that Defendant was 43 years old at the time of these events. No promises or threats were made to induce Defendant to waive his rights, nor was there any use of force. Although Defendant states in his motion that he was induced to make his statements based on promises of leniency, the Court finds no such promises were made, and even if the agent's statements regarding the possibility of a reduction in sentence in exchange for cooperation was perceived by Defendant as a promise of leniency -- and there is no

11

evidence that it was so perceived -- such statements are not sufficiently coercive to render his waiver involuntary. See United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001) (analogy about train leaving station and those who told the truth would be on the train not coercive); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (defendant's mistaken belief that he had been promised leniency would not render confession involuntary). Finally, although Defendant contends he lacked the education to understand his rights, there is no evidence in the record to support this assertion. To the contrary, Defendant stated that he understood his rights, at no time indicated otherwise, and did not ask any questions regarding his rights. See United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997) (waiver by French-Canadian suspect valid where he understood basic English, was read warnings line by line, and indicated he understood); United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir.1995) (waiver voluntary although the defendant was intoxicated when arrested and had average to lower than average intelligence and 8th grade education).

The government has also met its burden to establish that Defendant's statements were voluntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc), cert. denied, 543 U.S. 1145 (2005). In determining voluntariness, the court examines the totality of the circumstances. Id. Relevant factors include the length of the detention, the repetitive and prolonged nature of questioning, the

accused's age, and the questioning tactics. Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001). Here, the entire encounter lasted no more than 45 minutes; Defendant was repeatedly advised of his rights prior to any questioning; and no threats, force, or unfair questioning tactics were used. As such, the Court finds that Defendant's statements were voluntary and that no basis exists for the suppression of his statements.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. #214] be **Denied**.

**IT IS FURTHER RECOMMENDED** that the Government's Motion to Determine the Admissibility of Evidence, with respect to the statements made by this particular Defendant on January 15, 2009, [Doc. #145], be **Granted**.

The parties are advised that they have ten (10) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Trial in this matter will be scheduled by the Honorable Rodney W. Sippel.

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 29th day of June, 2009.